Case Nos. 13-4178, 14-5003, 14-5006

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| DEREK KITCHEN, individually, *et al.*,<br><br>    Plaintiffs-Appellees,<br><br>v.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah, *et al.*,<br><br>    Defendants-Appellants. | On appeal from the United States District Court for the District of Utah, Civil Case No. 2:13-CV-00217-RJS |
| MARY BISHOP, *et al.*,<br><br>    Plaintiffs-Appellees,<br><br>and<br>SUSAN G. BARTON, *et al.*,<br>    Plaintiffs-Appellees/Cross-Appellants,<br>v.<br>SALLY HOWE SMITH, in her official capacity as Court Clerk for Tulsa County, State of Oklahoma,<br><br>    Defendant-Appellant/Cross-Appellee. | On appeal from the United States District Court for the Northern District of Oklahoma, Civil Case No. 04-CV-848-TCK-TLW |

---

## Brief *Amicus Curiae* of The Becket Fund for Religious Liberty in Support of Defendants-Appellants and Reversal

---

Eric Rassbach
Asma Uddin
*The Becket Fund for Religious Liberty*
*3000 K St. NW, Suite 220*
*Washington, DC 20007*
*Tel: (202) 955-0095*
*Fax: (202) 955-0090*
*erassbach@becketfund.org*

*Attorneys for* Amicus Curiae

Appellate Case: 13-4178   Document: 01019260455   Date Filed: 02/10/2014   Page: 2

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, The Becket Fund for Religious Liberty states that it has no parent corporation and that no publicly held corporation owns any part of it.

*s/ Eric Rassbach*

Eric Rassbach
*The Becket Fund for Religious Liberty*
*3000 K St. NW, Suite 220*
*Washington, DC 20007*
*Tel: (202) 955-0095*
*Fax: (202) 955-0090*
*erassbach@becketfund.org*

Appellate Case: 13-4178   Document: 01019300453   Date Filed: 02/10/2014   Page: 3

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES .................................................................... iv

INTEREST OF THE *AMICUS* ............................................................... 1

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT ........................................................................................... 4

    I. According legal recognition to same-sex marriage without robust protections for religious liberty will trigger wide-ranging church-state conflict ...................................................... 4

        A. Leading legal scholars on both sides of the marriage debate recognize the conflict between same-sex marriage and religious liberty and support legislative exemptions. ....................................................... 7

        B. Mandating same-sex marriage through judicial decree will trigger a wave of private civil litigation under anti-discrimination laws never intended for that purpose .................................................................... 12

        C. Religious people and institutions that object to same-sex marriage will be penalized by state and local governments. ............................................................ 20

            1. Exclusion from government facilities and fora. ....... 21

            2. Loss of licenses or accreditation. ............................. 22

            3. Disqualification from government grants and contracts .................................................................... 24

            4. Loss of state or local tax exemptions. ..................... 25

            5. Loss of educational and employment opportunities ............................................................ 26

II. State legislatures and electorates are better able than federal courts to take into account all of the societal interests at stake, including protecting religious liberty. ........27

    A. Because many of the conflicts between same-sex marriage and religious liberty can be avoided—at least in part—by legislative exemptions, the federal judiciary should allow state legislatures and electorates to go first. ........................................................29

    B. Allowing state legislatures and electorates to decide both reinforces democratic values and allows room for compromise between conflicting societal interests. ..........................................................................32

CONCLUSION ..........................................................................37

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................38

CERTIFICATE OF SERVICE....................................................39

CERTIFICATE OF DIGITAL SUBMISSION ........................................41

Appellate Case: 13-4178   Document: 01019200459   Date Filed: 02/10/2014   Page: 5

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Attorney Gen'l v. Desilets,*
   636 N.E.2d 233 (Mass. 1994) ................................................................. 18

*Baehr v. Lewin,*
   852 P.2d 44 (Haw. 1993) .................................................................... 13

*Bernstein v. Ocean Grove Camp Meeting Ass'n,*
   Num. DCR PN34XB-03008
   (N.J. Off. of Att'y Gen., Div. on Civil Rts., Oct. 23, 2012) ..................... 16

*Bishop v. United States ex rel. Holder,*
   No. 04-cv-848, 2014 WL 116013 (N.D. Okla. 2014) ........................... 5, 13

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ......................................................................... 15

*Boy Scouts of Am. v. Till,*
   136 F. Supp. 2d 1295 (S.D. Fla. 2001) ................................................ 22

*Boy Scouts of Am. v. Wyman,*
   335 F.3d 80 (2d Cir. 2003) ................................................................ 22

*Brady v. Dean,*
   790 A.2d 428 (2001) ........................................................................ 26

*Butler v. Adoption Media, LLC,*
   486 F. Supp. 2d 1022 (N.D. Cal. 2007) .......................................... 13, 16

*Catholic Charities of Maine, Inc. v. City of Portland,*
   304 F. Supp. 2d 77 (D. Me. 2004) ...................................................... 25

*Collins v. City of Harker Heights, Tex.,*
   503 U.S. 115 (1992) ......................................................................... 28

*Cradle of Liberty Council, Inc. v. City of Philadelphia,*
   851 F. Supp. 2d 936 (E.D. Pa. 2012) .................................................. 22

*Dale v. Boy Scouts of Am.,*
   160 N.J. 562 (N.J. 1999) ................................................................... 15

*Elane Photography, LLC v. Willock*,
   309 P.3d 53 (N.M. 2013),
   *petition for cert. filed*, No. 13-585 (Nov. 8, 2013) ................................... 16

*Evans v. City of Berkeley*,
   129 P.3d 394 (Cal. 2006) ......................................................................... 22

*Garden State Equal. v. Dow*,
   62 A.3d 336 (N.J. Super. Ct. Law Div. 2013) .......................................... 29

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*,
   536 A.2d 1 (D.C. 1987) ............................................................................ 16

*Goodridge v. Dep't of Pub. Health*,
   798 N.E.2d 941 (Mass. 2003) ............................................................ 5, 29

*Griego v. Oliver*,
   --- P.3d ---- (N.M. 2013) ......................................................................... 29

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   132 S. Ct. 694 (2012) ............................................................................... 19

*Jackson v. Abercrombie*,
   884 F.Supp.2d 1065 (D. Haw. 2012) ....................................................... 27

*Kerrigan v. Comm'r of Pub. Health*,
   957 A.2d 407 (2008) ................................................................................. 29

*Kitchen v. Herbert*,
   No. 13-cv-217, 2013 WL 6697874 (D. Utah 2013) ....................... 5, 12, 21

*Levin v. Yeshiva Univ.*,
   754 N.E.2d 1099 (N.Y. 2001) .................................................................. 18

*Martinez v. Cnty. of Monroe*,
   850 N.Y.S.2d 740, 743 (N.Y. App. Div. 2008) ........................................ 13

*Perry v. Schwarzenegger*,
   704 F. Supp. 2d 921 (N.D. Cal. 2010) ..................................................... 29

*Smith v. Fair Emp't & Hous. Comm'n.*,
   51 Cal. Rptr. 2d 700 (Cal. 1996) ............................................................. 18

*Spencer v. World Vision, Inc.*,
   633 F.3d 723 (9th Cir. 2011) ................................................................... 19

*State by Cooper v. French,*
  460 N.W.2d 2 (Minn. 1990) ...................................................... 18

*Swanner v. Anchorage Equal Rights Comm'n,*
  874 P.2d 274 (Alaska 1994) .................................................... 18

*Thomas v. Anchorage Equal Rights Comm'n,*
  102 P.3d 937 (Alaska 2004) .................................................... 18

*United States v. Jarvis,*
  299 F. App'x 804 (10th Cir. 2008) ........................................ 28

*Varnum v. Brien,*
  763 N.W.2d 862 (Iowa 2009) ................................................ 29

*Walz v. Tax Comm'n,*
  397 U.S. 664, 692 (1970) ........................................................ 35

*Ward v. Polite,*
  667 F.3d 727 (6th Cir. 2012) .......................................... 24, 27

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ................................................................ 28

## Statutes

102 Mass. Code Regs. § 1.03(1) ................................................. 23

102 Mass. Code Regs. § 5.04(1)(c) ............................................. 23

110  Mass. Code Regs. § 1.09(2) ............................................... 23

2012 Md. Laws ch. 2 § 2-2 ......................................................... 30

2012 Md. Laws ch. 2 § 2-3 ......................................................... 30

2012 Md. Laws ch. 2 § 2-4 ......................................................... 30

2012 Me. Legis. Serv. § 1 (I.B. 3) ............................................. 29

750 Ill. Comp. Stat. Ann. 5 / 209 ............................................. 30

Conn. Gen. Stat. § 38a-624a ..................................................... 29

Conn. Gen. Stat. § 46b-35a ....................................................... 29

Conn. Gen. Stat. § 46b-35b ........................................................................ 29

D.C. Code § 46-406(e) ............................................................................... 31

Del. Code Ann. tit. 13, § 106 ..................................................................... 30

Haw. Rev. Stat. § 572-12.1 ........................................................................ 30

Haw. Rev. Stat. § 572-12.2 ........................................................................ 30

Md. Code Ann., Fam. Law § 2-201 ............................................................ 30

Md. Code Ann., Fam. Law § 2-202 ............................................................ 30

Md. Code Ann., Fam. Law § 2-406 ............................................................ 30

Me. Rev. Stat. Ann. tit. 19-A, § 655 ......................................................... 30

Minn. Stat. Ann. § 517.09 .......................................................................... 30

N.H. Rev. Stat. § 457:37 ............................................................................ 30

N.Y. Dom. Rel. Law § 11(1) ...................................................................... 30

Okla. Stat. Ann. tit. 25, § 1402 ................................................................. 14

Okla. Stat. Ann. tit. 25, § 1452 ........................................................... 17, 19

Okla. Stat. Ann. tit. 25, § 1506.9 ........................................................ 17, 19

R.I. Gen. Laws Ann. § 15-3-6.1 ................................................................ 30

Salt Lake County, Utah, Code of City Ordinances, ch. 10.14.070 ...... 17, 19

Utah Code Ann. § 57-21-5 .................................................................. 17, 19

Utah Code Ann. § 13-7-1 ........................................................................... 14

Utah Code Ann. § 13-7-3 ........................................................................... 14

Vt. Stat. Ann. 9 § 4502(l) (2009) .............................................................. 30

Wash. Rev. Code § 26.04.010 (2012) ........................................................ 30

## Other Authorities

*A Festive Mood in Maine as Same-Sex Marriage Becomes Legal*,
  N.Y. Times, Dec. 30, 2012, at A20 ........................................................... 35

Amy Guttman & Dennis Frank Thompson,
  *Democracy and Disagreement* (1996) ....................................... 34

Andrew Koppelman,
  *You Can't Hurry Love: Why Antidiscrimination Protections*
  *for Gay People Should Have Religious Exemptions*,
  72 Brook. L. Rev. 125 (2006) ..................................................... 11

Becket Fund for Religious Liberty,
  *Selected Anti-Discrimination Statutory Provisions*
  *and Marriage-Relevant Exceptions by State* ..................................... 14, 19

Boy Scouts of America Statement (May 23, 2013) .................................... 21

D. Smith, *Accreditation committee decides to keep religious exemption*,
  33 Monitor on Psychology 1 (Jan. 2002) .................................... 23

David Blankenhorn & Jonathan Rauch, *A Reconciliation on Gay Marriage,*
  N.Y. Times, Feb. 21, 2009, at WK11 ....................................... 11

Hutchinson, Kan. Human Relations Commission,
  *Definitions and FAQs Under Proposed Sexual Orientation*
  *and Gender Identity Protections* (2012) .................................... 15

Ira C. Lupu & Robert W. Tuttle,
  *Same-Sex Family Equality and Religious Freedom*,
  5 Nw. J. L. & Soc. Pol'y 274 (2010) .......................................... 10

Isaiah Berlin, "Two Concepts of Liberty,"
  *in Four Essays on Liberty* (Oxford 1969) ................................ 33

John Hart Ely, *Democracy and Distrust* (1980) ....................................... 33

Letter from Prof. Douglas Laycock and others
  to Hawaii Legislators (Oct. 23, 2013) ....................................... 9

Letter from Prof. Edward McGaffney, Jr. and others
  to Hawaii legislators, (Oct. 17, 2013) ....................................... 9

*Maine Rejects Same-Sex Marriage Law*, CNN.com, Nov. 4, 2009 ............................. 35

Melissa Walker, *YMCA rewrites rules for lesbian couples*,
Des Moines Register, Aug. 6, 2007 .......................................................... 15

Michelle Boorstein, *Citing same-sex marriage bill,*
*Washington Archdiocese ends foster-care program*,
Wash. Post, Feb. 17, 2010 ....................................................................... 25

Mirror of Justice, *Archive: Memos/Letters on*
*Religious Liberty and Same-Sex Marriage* (2009) .................................... 9

Pam Belluck, *Massachusetts Arrives at Moment for Same-Sex Marriage*,
N.Y. Times, May 17, 2004 (Massachusetts Justices of the Peace) ........................ 27

Patricia Wen, *"They Cared for the Children": Amid Shifting Social Winds,*
*Catholic Charities Prepares to End Its 103 Years of Finding Homes*
*for Foster Children and Evolving Families*,
Boston Globe, June 25, 2006 at A1 .......................................................... 23

Prof. Richard A. Epstein, *Same-Sex Union Dispute: Right Now Mirrors Left*,
Wall St. J., July 28, 2004, at A13 ............................................................ 26

Mirror of Justice, *Response from Scholars Supporting*
*'Marriage Conscience' Religious Liberty Protection* (Nov. 13, 2013) ..................... 10

Robert Huckfeldt, Paul E. Johnson & John Sprague,
*Political Disagreement* (2004) ................................................................. 33

Robin Fretwell Wilson, *A Matter of Conviction:*
*Moral Clashes Over Same-Sex Adoption*,
22 BYU J. Pub. L. 475 (2008) ................................................................. 27

*Same-Sex Marriage and Religious Liberty: Emerging Conflicts*
(Douglas Laycock, Anthony R. Picarello Jr. &
Robin Fretwell Wilson eds., 2008) .................................................... passim

Vivian Berger *et al.*, *Summary Judgment Benchmarks*
*for Settling Employment Discrimination Lawsuits*,
23 Hofstra Lab. & Emp. L.J. 45 (2005) ..................................................... 5

William N. Eskridge, Jr., *A Jurisprudence of "Coming Out": Religion,*
*Homosexuality, and Collisions of Liberty and Equality in American Law*,
106 Yale L.J. 2411 (1997) ...................................................................... 10

William Wan, *Same-Sex Marriage Leads Catholic Charities to Adjust Benefits*,
Wash. Post, March 2, 2010 ..................................................................... 20

Zylstra, Sarah Eekhoff, "Evangelicals' Favorite Same-Sex Marriage Law?"
    *Christianity Today*, Jan. 1, 2014 ................................................................ 31

## INTEREST OF THE *AMICUS*[1]

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. It has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Native Americans, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world. It is frequently involved, both as counsel of record and as *amicus curiae*, in cases seeking to preserve the freedom of all religious people to pursue their beliefs without excessive government interference.

The Becket Fund has also represented religious people and institutions with a wide variety of views about same-sex marriage and homosexuality, including religious people and institutions on all sides of the same-sex marriage debate, and including both non-LGBT and LGBT clients. As a religious liberty law firm, the Becket Fund does not take a position on same-sex marriage as such, but focuses instead on same-sex marriage only as it relates to religious liberty.

---

[1] No party's counsel authored the brief in whole or in part, and no one other than *Amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

The Becket Fund has long sought to facilitate academic discussion of the impact that according legal recognition to same-sex marriage could have on religious liberty. In 2005, it hosted a conference of noted First Amendment scholars—representing the full spectrum of views on same-sex marriage—to assess the religious freedom implications of legally-recognized same-sex marriage. The conference resulted in the book *Same-Sex Marriage and Religious Liberty: Emerging Conflicts* (Douglas Laycock, Anthony R. Picarello Jr. & Robin Fretwell Wilson eds., 2008) ("*Emerging Conflicts*"). To date, *Emerging Conflicts* remains the touchstone of scholarly discourse about the intersection of same-sex marriage and religious liberty.

Based on its expertise in the field of religious liberty generally, and the intersection of same-sex marriage and religious liberty specifically, the Becket Fund submits this brief to demonstrate that concerns about the potential conflict between same-sex marriage and religious liberty are both rational and well-founded in fact. In its view, this conflict is best resolved not by judicial decree, but by the legislative process, which is more adept at balancing competing societal interests, including specifically the interest in religious liberty.

## SUMMARY OF ARGUMENT

*Amicus* submits this brief to draw the Court's attention to two important aspects of the appeals now before it.

First, the lower courts' decision to impose same-sex marriage by judicial decree will automatically trigger civil liability for religious people and institutions, and will expose them to significant government penalties. Church-state scholars on all sides of the same-sex marriage debate agree that these conflicts will come unless mitigating religious conscience protections are enacted. Every state to enact same-sex marriage has responded to this concern by including religious liberty protections in the enacting legislation.

Prudence dictates that this Court not allow the lower courts to make a similar political process impossible in Utah and Oklahoma. Moreover, if avoiding such a societal conflict is *prudent*, it was perforce *rational* for the legislatures and electorates of Utah and Oklahoma to seek to do so.

Second, the Court should recognize that federal judicial intervention will cut off the democratic process of debate regarding religious liberty protections and same-sex marriage. State legislatures and electorates are actively engaged in debating religious liberty and same-sex

marriage. Indeed, few could have predicted that in the ten years after the *Goodridge* decision a full third of American states would recognize same-sex marriage. That the nation has changed so quickly through state political processes counsels federal judicial restraint. The federal courts can avoid treading on the prerogatives of state sovereigns and the democratic process by allowing the debate time to work its way through American society.

## ARGUMENT

### I. According legal recognition to same-sex marriage without robust protections for religious liberty will trigger wide-ranging church-state conflict.

Recognizing a constitutional right to same-sex marriage without simultaneously protecting conscience rights will trigger threats to the religious liberty of people and organizations who cannot, as a matter of conscience, treat same-sex unions as the moral equivalent of opposite-sex marriage. Several factors indicate that without conscience protections, widespread and intractable church-state conflicts will result.

First, the relatively short history of same-sex marriage thus far indicates that there will be a great deal of litigation in the future. The

first state to give civil recognition to same-sex marriage was Massachusetts, in 2003, and every other state to recognize same-sex marriage has done so within the last six years.[2] Even so, litigation has already begun. Because litigation under anti-discrimination laws increases exponentially over time, a few lawsuits now are a strong indicator of many more lawsuits to come.[3] The conflict between religious liberty and same-sex marriage will therefore be a widespread one.

Second, a ruling from this Court that objecting to same-sex marriage is always irrational, or, as the courts below stated,[4] that making distinctions regarding same-sex marriage constitutes gender or sexual orientation discrimination, will have two major negative effects on religious objectors. One is that they will immediately be vulnerable to

---

[2] *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941; Connecticut (2008); Iowa (2009); Vermont (2009); New Hampshire (2010); Washington, D.C. (2010); New York (2011); Washington (2012); Maine (2013); Maryland (2013); California (2013); New Mexico (2013); Hawaii (2013); Minnesota (2013); Delaware (2013); New Jersey (2013); Illinois (will take effect June 1, 2014).

[3] See, *e.g.,* Vivian Berger *et al., Summary Judgment Benchmarks for Settling Employment Discrimination Lawsuits*, 23 Hofstra Lab. & Emp. L.J. 45, 45 (2005) ("The number of employment discrimination lawsuits rose continuously throughout the last three decades of the twentieth century. In the federal courts, such filings grew 2000% . . . .").

[4] *Kitchen v. Herbert*, No. 13-cv-217, 2013 WL 6697874 (D. Utah 2013) at *20; *Bishop v. United States ex rel. Holder*, No. 04-cv-848, 2014 WL 116013 (N.D. Okla. 2014) at *25.

lawsuits under anti-discrimination laws never designed for that purpose. Many Utah and Oklahoma state and local laws prohibit gender, sexual orientation, or gender identity discrimination. These laws would be triggered by recognition of same-sex marriage in these appeals.

The other negative effect is that this Court's disapprobation would cast suspicion on religious objectors in a way that existing laws against gender and sexual orientation discrimination do not. Were this Court to conclude, as the plaintiffs argued, that a distinction between opposite-sex marriage and other legal relationships is rooted in "bias and prejudice,"[5] then these longstanding practices will suddenly become *prima facie* evidence of anti-gay discrimination, instead of what they are: expressions of longstanding moral worldviews that put opposite-sex marriage at the center of human sexuality.

Given these factors, it is not surprising that a scholarly consensus has emerged that giving legal recognition to same-sex marriage will result in widespread, foreseeable, and to some extent legislatively avoidable church-state conflict. Some scholars argue that the rights of

---

[5] *Kitchen*, Tr. of Dec. 4, 2013 Oral Arg. at 103.

Appellate Case: 13-4178   Document: 01019200459   Date Filed: 02/10/2014   Page: 18

religious believers should nearly always give way to the right of gays and lesbians to be free from discrimination.[6] Others support strong exemptions for objecting religious believers.[7] But there is widespread scholarly agreement that the conflict will arise.

Since *Baehr* and other early cases did not even recognize these conflicts—let alone resolve them—it was entirely rational for Utah and Oklahoma to respond as they did. And given the certainty of those conflicts, it would be prudent for this Court to stay its hand and allow the political process an opportunity to mitigate those conflicts.

A.  **Leading legal scholars on both sides of the marriage debate recognize the conflict between same-sex marriage and religious liberty and support legislative exemptions.**

As noted above, there is a clear consensus among leading legal scholars that conflicts between same-sex marriage and religious liberty are real and should be legislatively addressed. In the *Emerging Conflicts* book, seven prominent scholars of First Amendment law agreed that legal recognition of same-sex marriage, without more, would create widespread conflicts with religious liberty. *See*, *e.g.*, Marc

---

[6] Chai R. Feldblum, *Moral Conflict and Conflicting Liberties*, *in Emerging Conflicts* 123, 154.

[7] Douglas Laycock, *Afterword*, *in Emerging Conflicts* 189, 197-201.

D. Stern, *Same-Sex Marriage and the Churches, in Emerging Conflicts* 1 (describing scope of anticipated conflicts). Leading LGBT rights advocate Chai Feldblum argued that conscientious objections to same-sex marriage are legitimate:

> I believe those who advocate for LGBT equality have downplayed the impact of such [anti-discrimination] laws on some people's religious beliefs and, equally, I believe those who have sought religious exemptions from such civil rights laws have downplayed the impact that such exemptions would have on LGBT people.

Chai R. Feldblum, *Moral Conflict and Conflicting Liberties*, *in Emerging Conflicts* 123, 124-25. Feldblum treated religious liberty concerns as well-founded, though she ultimately concluded that religious objections should fail. *See id.* at 155-56.

Others, such as leading religious liberty scholar Douglas Laycock—who likewise supports giving legal recognition to same-sex marriage—argue that some conflicts between same-sex marriage and religious liberty are unavoidable, but some could be mitigated by providing conscience protections. *See, e.g.,* Douglas Laycock, *Afterword*, *in Emerging Conflicts* 189, 197-201. There is a consensus, however, that serious conflicts between same-sex marriage and religious liberty exist.

In addition to the scholarly consensus that there is a conflict, there is also a scholarly consensus that the conflict should be addressed by enacting legislative exemptions for conscientious objectors. The subject of scholarly debate is thus not over whether there should be exemptions, but the form and scope of those exemptions.

For example, legal scholars that support (or are neutral towards) adoption of same-sex marriage or have written a series of detailed open letters to legislators in states considering same-sex marriage legislation, arguing that threats to religious liberty should be legislatively addressed. *See*, *e.g.*, Letter from Prof. Edward McGaffney, Jr. and others to Hawaii legislators, (Oct. 17, 2013), *available at* http://mirrorofjustice.blogs.com/files/hawaii-special-session-letter-10-17-13-1.pdf (describing proposed religious protections); Letter from Prof. Douglas Laycock and others to Hawaii Legislators (Oct. 23, 2013), *available at* http://mirrorofjustice.blogs.com/files/hawaii-2013-fall-based-1.docx (supporting both same-sex marriage and strong religious exemptions). These scholars have also presented testimony to state legislative bodies considering religious liberty protections. *See also* Mirror of Justice, *Archive: Memos/Letters on Religious Liberty and*

*Same-Sex Marriage* (2009) ("Archive") (complete collection of scholarly letters and legislative testimony).[8] Other scholars have acknowledged the need for exemptions, though they disagree about the scope of the religious liberty protections that should be enacted.[9] This disagreement has resulted in an ongoing and vigorous debate about the proper scope of exemptions.[10]

Leading scholars within the LGBT rights movement also advocate legislative protections for religious objectors. Professor William Eskridge of Yale has written that "Gay rights advocates put [the religious exemption] provision in ENDA, and it should be retained."[11] Professor Andrew Koppelman of Northwestern and Jonathan Rauch of the Brookings Institution have both advocated legislative

---

[8] http://mirrorofjustice.blogs.com/mirrorofjustice/2009/08/memosletters-on-religious-liberty-and-samesex-marriage.html.

[9] *See* Ira C. Lupu & Robert W. Tuttle, *Same-Sex Family Equality and Religious Freedom*, 5 Nw. J. L. & Soc. Pol'y 274 (2010).

[10] *See, e.g.,* Mirror of Justice, *Response from Scholars Supporting 'Marriage Conscience' Religious Liberty Protection* (Nov. 13, 2013) (describing scholarly debate over Illinois provisions), *available at* http://mirrorofjustice.blogs.com/mirrorofjustice/2013/11/response-on-same-sex-marriage-and-religious-liberty.html,

[11] William N. Eskridge, Jr., *A Jurisprudence of "Coming Out": Religion, Homosexuality, and Collisions of Liberty and Equality in American Law*, 106 Yale L.J. 2411, 2456 (1997) (referring to proposed Employment Non-Discrimination Act).

accommodations as a solution to the conflict between same-sex marriage and religious liberty.[12]

There is thus a scholarly consensus that the conflicts between same-sex marriage and religious liberty are real, deeply rooted, and far-reaching. And, although they disagree about the proper scope of religious liberty protections, scholars have reached a separate consensus that these conflicts can be significantly mitigated by carefully-crafted legislative exemptions. The disagreement lies in the scope of those protections.

These consensus positions reinforce the common-sense conclusion that the legislatures and people of Utah and Oklahoma acted rationally when they rejected giving legal recognition to same-sex marriage without conscience protections. And they counsel judicial restraint in the cases before the Court.

---

[12] *See, e.g.,* Andrew Koppelman, *You Can't Hurry Love: Why Antidiscrimination Protections for Gay People Should Have Religious Exemptions*, 72 Brook. L. Rev. 125 (2006); David Blankenhorn & Jonathan Rauch, *A Reconciliation on Gay Marriage,* N.Y. Times, Feb. 21, 2009.

### B. Mandating same-sex marriage through judicial decree will trigger a wave of private civil litigation under anti-discrimination laws never intended for that purpose.

As the scholarly consensus indicates, religious institutions face significant new sources of civil liability if same-sex marriage is given legal recognition without concurrent protections for individuals and institutions with conscientious objections. This reality poses special problems in these appeals, because allowing the decisions below to stand will immediately trigger civil liability under state anti-discrimination laws that do not contain strong conscience protections that a legislature can provide but a court cannot.

And without strong conscience protections, giving legal recognition to same-sex marriage will enable same-sex spouses to bring suit against religious institutions under gender, sexual orientation, and gender identity anti-discrimination laws, most of which were never designed to reach claims by members of same-sex marriages.

The decisions below demonstrate this amply: both held that maintaining a distinction between opposite-sex marriage and other legal relationships constitutes unlawful discrimination. *Kitchen*, 2013 WL 6697874, at *20 (limitation of marriage to opposite-sex couples is

form of sex discrimination); *Bishop*, 2014 WL 116013, at *25 (limitation of marriage to opposite-sex couples "is best described as sexual-orientation discrimination"). *See also*, *Martinez v. Cnty. of Monroe*, 850 N.Y.S.2d 740, 743 (N.Y. App. Div. 2008) (refusal to provide benefits based on same-sex marriage contracted in Ontario violated New York's prohibition on marital status discrimination); *Baehr v. Lewin*, 852 P.2d 44, 64 (Haw. 1993) (limitation of marriage to opposite-sex couples was form of sex-based discrimination); *Butler v. Adoption Media, LLC*, 486 F.Supp.2d 1022, 1056 (N.D. Cal. 2007) (allowing marital status claim to go forward in dispute over adoption by same-sex couple).

While some anti-discrimination laws, especially those concerning sexual orientation discrimination, include religious exemptions, in most cases they do not, and the accommodations are also simply not designed to respond to federal judicial redefinition of civil marriage.

What follows is a non-exhaustive description of the conflicts that will be triggered if the decisions below are not reversed.

**Public accommodation laws.** Religious institutions often provide a broad array of programs and facilities to their members and to the general public, such as hospitals, schools, adoption services, and marital

counseling. Religious institutions typically enjoy some latitude in choosing what religiously-motivated services and facilities they will provide. But giving legal recognition to same-sex marriage without robust conscience exemptions will restrict that freedom in at least two ways.

First, most states, including Utah and Oklahoma and other Tenth Circuit states, include gender, marital status, or sexual orientation as protected categories under public accommodations laws. *See* Utah Code Ann. §§ 13-7-1, 13-7-3 (gender discrimination); Okla. Stat. Ann. tit. 25, § 1402 (gender discrimination); *see also* Becket Fund for Religious Liberty, *Selected Anti-Discrimination Statutory Provisions and Marriage-Relevant Exceptions by State*, http://www.becketfund.org/wp-content/uploads/2013/11/AntiDiscriminationStatutes1.2013.pdf ("*Selected Provisions*")(listing public accommodation anti-discrimination provisions in every state).

Second, religious institutions and their related ministries are facing increased risk of being declared places of public accommodation, and thus being subject to legal regimes designed to regulate secular businesses. For example, some laws require church halls be treated as

public accommodations if they are rented to non-members. *See*, *e.g.*, Hutchinson, Kan. Human Relations Commission, *Definitions and FAQs Under Proposed Sexual Orientation and Gender Identity Protections* 4 (2012).[13] When coupled with legally-recognized same-sex marriage, these two facts create significant liability risk for religious objectors. Indeed, expansion of the definition of "public accommodation" is what precipitated the divisive *Boy Scouts v. Dale* litigation: unlike other states, New Jersey's Supreme Court held that the Boy Scouts were a "place of public accommodation."[14]

This risk is greatest for those religious organizations that serve people with different beliefs. Unfortunately, the more a religious organization seeks to minister to the general public (as opposed to just coreligionists), the greater the risk that the service will be regarded as a public accommodation giving rise to liability.

Some of the many religiously-motivated services that could be "public accommodations" are: health-care services, marriage counseling, family

---

[13] http://www.hutchgov.com/egov/docs/1332537777_170654.pdf.
[14] *Dale v. Boy Scouts of Am.*, 160 N.J. 562, 602 (N.J. 1999), *reversed*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).

counseling, job training programs, child care, gyms and day camps,[15] life coaching, schooling,[16] adoption services,[17] and the use of wedding ceremony facilities.[18] And religious business owners face the same risks: when New Mexico photographer Elaine Huguenin declined for religious reasons to photograph a same-sex commitment ceremony, she was sued under the New Mexico Human Rights Act and required to pay nearly $7,000 on the basis that her business constituted a public accommodation. *Elane Photography, LLC v. Willock*, 309 P.3d 53, 77 (N.M. 2013), *petition for cert. filed*, No. 13-585 (Nov. 8, 2013).

Of the thousands of American religious organizations that serve others in one or more of the ways mentioned above, many simply want to avoid the appearance—and reality—of condoning or subsidizing

---

[15] See Melissa Walker, *YMCA rewrites rules for lesbian couples*, Des Moines Register, Aug. 6, 2007 (city forced YMCA to change its definition of "family" or lose grant).

[16] See *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1 (D.C. 1987) (en banc) (public accommodations statute required equivalent access to all university facilities.).

[17] See *Butler*, 486 F.Supp.2d 1022 (Arizona adoption facilitation website was public accommodation under California law).

[18] See *Bernstein v. Ocean Grove Camp Meeting Ass'n*, Num. DCR PN34XB-03008 (N.J. Off. of Att'y Gen., Div. on Civil Rts., Oct. 23, 2012) (Methodist organization violated public accommodations law by denying same-sex couples use of wedding pavilion because it opened pavilion for other weddings).

same-sex marriage through their "family-based" services. But allowing the decisions below to stand would immediately expose these organizations to civil liability.[19]

**Housing discrimination laws.** Religious colleges and universities frequently provide student housing and often give special treatment to married couples. Legally married same-sex couples could reasonably be expected to seek these benefits, but many religious educational institutions would conscientiously object to providing support for same-sex unions. Housing discrimination lawsuits would result.

In Utah and Oklahoma, state and local housing laws ban discrimination on the basis of gender, marital status, and sexual orientation. *See*, *e.g.*, Utah Code Ann. § 57-21-5 (gender); Okla. Stat. Ann. tit. 25, §§ 1452, 1506.9 (gender); Salt Lake County, Utah, Code of City Ordinances, ch. 10.14.070 (sexual orientation and gender identity); *see also Selected Provisions*.

---

[19] In the "Prop 8" litigation before the Supreme Court, the argument was made that there would be no trigger of public accommodation and other anti-discrimination laws because California already gave civil unions the same rights as civil marriages. That argument has no purchase in these appeals since neither Utah nor Oklahoma recognizes civil unions.

In several states, courts have required landlords to facilitate the unmarried cohabitation of their tenants, over strong religious objections.[20] If unmarried couples cannot be discriminated against in housing due to marital status protections, legally married same-sex couples would have comparatively stronger protection, as public policy tends to favor and subsidize marriage as an institution. *See Levin v. Yeshiva Univ.*, 754 N.E.2d 1099 (N.Y. 2001) (lesbian couple stated valid disparate impact sexual orientation discrimination claim). If same-sex marriage is adopted without religious protections, plaintiffs would not have to rely on sexual orientation discrimination claims—the much more common laws against gender discrimination would suffice.

**Employment discrimination laws.** Religious organizations that object to same-sex marriage may also face private lawsuits when one of their employees enters into a civilly-recognized same-sex marriage. For

---

[20] *See Smith v. Fair Emp't & Hous. Comm'n.*, 51 Cal. Rptr. 2d 700 (Cal. 1996) (no substantial burden on religion where landlord required to rent to unmarried couples despite sincere religious objections because landlord could avoid the burden by exiting the rental business). *See also Thomas v. Anchorage Equal Rights Comm'n,* 102 P.3d 937, 939 (Alaska 2004); *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274 (Alaska 1994); *Attorney Gen'l v. Desilets*, 636 N.E.2d 233, 235 (Mass. 1994). *But see State by Cooper v. French,* 460 N.W.2d 2 (Minn. 1990) (state constitutional protection of religious conscience exempted landlord from ban against marital status discrimination in housing).

many religious institutions, an employee's entering a same-sex marriage would constitute a public repudiation of the institution's core religious beliefs in a way that less public relationships do not. Some employers will respond by changing the terms of employment for those employees. These employees may then sue under laws prohibiting gender, sexual orientation, or marital status discrimination in employment. *See* Okla. Stat. Ann. tit. 25, §§ 1452, 1506.9 (gender); Utah Code Ann. § 57-21-5 (gender); Salt Lake County, Utah, Code of City Ordinances, ch. 10.13.070 (sexual orientation and gender identity); *see also Selected Provisions*. If the employee is a "minister," or the relevant statute includes an exemption, then the defendant religious employer could raise an affirmative defense. *See*, *e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 707 (2012); *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) *cert. denied,* 132 S. Ct. 96 (2011) (applying Title VII's religious exemption). But where the employee does not qualify as a minister and no legislative exemption is in place, the employer will be exposed to liability for any alleged adverse employment action.

Moreover, if same-sex marriage is adopted without protections, religious employers may be automatically required to provide insurance to all legal spouses—both opposite-sex and same-sex—to comply with anti-discrimination laws. For example, after the District of Columbia passed a same-sex marriage law without strong conscience protections, the Catholic Archdiocese of Washington was forced to stop offering spousal benefits to any of its new employees.[21]

In short, allowing the lower court decisions to stand will automatically result in significant exposure to civil liability for religious dissenting people and institutions.

## C. Religious people and institutions that object to same-sex marriage will be penalized by state and local governments.

Adopting same-sex marriage also exposes religious organizations to the denial of generally available government benefits. Where same-sex marriage is adopted without religious protections, those who conscientiously object to such marriages can be labeled unlawful "discriminators" and thus denied access to otherwise generally available

---

[21] William Wan, *Same-Sex Marriage Leads Catholic Charities to Adjust Benefits*, Wash. Post, March 2, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/03/01/AR2010030103345.html.

state and local government benefits. This would be particularly likely were this Court to adopt the Utah plaintiffs' view that "religiously grounded" "prejudice and bias" is the reason for Utah's rule. *Kitchen*, Dec. 4, 2013 Transcript at 103.

The government benefits which are placed at risk in a judicial imposition of same-sex marriage fall into five general categories: (1) access to government facilities and fora, (2) government licenses and accreditation, (3) government grants and contracts, (4) tax-exempt status, and (5) educational opportunities.

## 1. Exclusion from government facilities and fora.

Religious institutions that object to same-sex marriage will face challenges to their ability to access a diverse array of government facilities and fora. This is borne out in the reaction to the Boy Scouts' membership standards regarding homosexual conduct.[22] The Boy Scouts have had to fight to gain equal access to public after-school

---

[22] On May 23, 2013, the Boy Scouts announced that, effective January 1, 2014, they would no longer "deny[] membership to youth on the basis of sexual orientation alone." Boy Scouts of America Statement, *available                                                                              at* http://www.scouting.org/sitecore/content/membershipstandards/resoluti on/results.aspx. However, the Scouts did not change their adult membership or youth conduct standards. *Id.*

Appellate Case: 13-4178    Document: 01019280459    Date Filed: 02/10/2014    Page: 33

facilities.[23] They have lost leases to city campgrounds and parks,[24] a lease to a government building that served as their headquarters for 79 years,[25] and the right to participate in a state-facilitated charitable payroll deduction program.[26] If same-sex marriage is adopted without robust protections for conscientious objectors, religious organizations that object to same-sex marriage would expect to face similar penalties under these more-restrictive laws.

## 2. Loss of licenses or accreditation.

A related concern exists with respect to licensing and accreditation decisions. In Massachusetts, for example, the state threatened to revoke the adoption license of Boston Catholic Charities because it refused on religious grounds to place foster children with same-sex couples. Rather than violate its religious beliefs, Catholic Charities shut down its

---

[23] *Boy Scouts of Am. v. Till*, 136 F. Supp. 2d 1295 (S.D. Fla. 2001) (challenge to Boy Scouts' use of school facilities).

[24] *Evans v. City of Berkeley*, 129 P.3d 394 (Cal. 2006) (equal access to boat berths denied to Scouts).

[25] *Cradle of Liberty Council, Inc. v. City of Philadelphia*, 851 F. Supp. 2d 936, 939 (E.D. Pa. 2012).

[26] *Boy Scouts of Am. v. Wyman*, 335 F.3d 80 (2d Cir. 2003) (Boy Scouts could be excluded from state's workplace charitable contributions campaign).

adoption services.[27] This sort of licensing conflict would only increase after judicial recognition of same-sex marriage, since governments would be required to treat all civil marriages identically.

Similarly, religious colleges and universities have been threatened with the loss of accreditation because they object to sexual conduct outside of opposite-sex marriage. In 2001, for example, the American Psychological Association, the accrediting body for professional psychology programs, threatened to revoke the accreditation of religious colleges that prefer coreligionists, in large part because of concerns about "codes of conduct that prohibit sex outside of marriage and homosexual behavior."[28] Where same-sex marriage is adopted without strong religious protections, religious colleges and universities that

---

[27] Patricia Wen, "*They Cared for the Children*": *Amid Shifting Social Winds, Catholic Charities Prepares to End Its 103 Years of Finding Homes for Foster Children and Evolving Families*, Boston Globe, June 25, 2006 (Catholic Charities had to choose between following Church beliefs and continuing to offer social services); *cf.* 102 Mass. Code Regs. §§ 1.03(1), 5.04(1)(c); 110 Mass. Code Regs. § 1.09(2) (regulations requiring non-discrimination based upon marital status and sexual orientation).

[28] D. Smith, *Accreditation committee decides to keep religious exemption*, 33 Monitor on Psychology 1 (Jan. 2002) (describing why APA ultimately abandoned proposal).

oppose same-sex marriage will likely face similar threats. The same issue will also affect licensed professionals.[29]

### 3. Disqualification from government grants and contracts.

Religious universities, charities, hospitals, and social service organizations often serve secular government purposes through contracts and grants. For instance, religious colleges participate in state-funded financial aid programs, religious counseling services provide marital counseling and substance abuse treatment, and religious homeless shelters care for those in need.

Many contracts and grants require recipients to be organized "for the public good" and forbid recipients to act "contrary to public policy." If same-sex marriage is recognized without specific accommodations for religious organizations, those organizations that refuse to approve, subsidize, or perform same-sex marriages could be found to violate such standards, thus disqualifying them from participation in government contracts and grants. In the marriage context, religious universities that oppose same-sex marriage could be denied access to government programs (such as scholarships, grants, or tax-exempt bonds) by

---

[29] *See* discussion of *Ward v. Polite*, *infra*.

governmental agencies that adopt an aggressive view of applicable anti-discrimination standards.

Religious organizations opposed to same-sex marriage also face the loss of government social service contracts. Catholic Charities in the District of Columbia was forced to stop providing foster care services due to its religious beliefs regarding the recognition of same-sex marriages.[30] If same-sex marriage is given legal recognition without accommodation for religious objectors, many religious organizations will be forced either to extend benefits to same-sex spouses against their religious beliefs or be debarred from government social services contracts.[31]

## 4. Loss of state or local tax exemptions.

Most religious institutions have charitable tax-exempt status under federal, state and local laws. But without conscience protections, that

---

[30] Michelle Boorstein, *Citing same-sex marriage bill, Washington Archdiocese ends foster-care program*, Wash. Post, Feb. 17, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/02/16/AR2010021 604899.html.

[31] See, *e.g.*, *Catholic Charities of Maine, Inc. v. City of Portland,* 304 F. Supp. 2d 77 (D. Me. 2004) (upholding ordinance forcing religious charity to either extend employee spousal benefit programs to registered same-sex couples, or lose access to all city housing and community development funds).

status could be stripped by local governments based solely on that religious institution's conscientious objection to same-sex marriage.[32] Whether the First Amendment could provide an effective defense to this kind of penalty is an open question.[33]

## 5. Loss of educational and employment opportunities.

The conflict between same-sex marriage and religious liberty affects individual religious believers, too. Vermont has held that individual town clerks may be fired if they seek to avoid issuing civil union licenses to same-sex couples for religious reasons, and at least twelve Massachusetts Justices of the Peace had to resign because they could not facilitate same-sex marriages.[34] The situation is particularly acute

---

[32] "[P]rivate churches losing their tax exemptions for their opposition to homosexual marriages . . . are among the very dangers from the left against which I warned."  Prof. Richard A. Epstein, *Same-Sex Union Dispute: Right Now Mirrors Left*, Wall St. J., July 28, 2004, at A13.

[33] See Jonathan Turley, *An Unholy Union: Same-Sex Marriage and the Use of Governmental Programs to Penalize Religious Groups with Unpopular Practices*, *in Emerging Conflicts* 59, 64-65 (supporting same-sex marriage but arguing that objectors' tax exemptions should not be stripped); Douglas Kmiec, *Same-Sex Marriage and the Coming Antidiscrimination Campaigns Against Religion*, *in Emerging Conflicts* 103, 108-11 (arguing that *Bob Jones* should not apply to conscientious objectors to same-sex marriage).

[34] *Brady v. Dean*, 790 A.2d 428 (Vt. 2001) (Vermont clerks); Pam Belluck, *Massachusetts Arrives at Moment for Same-Sex Marriage*, N.Y. Times, May 17, 2004 (Massachusetts Justices of the Peace) , *available*

for state-employed professionals like social workers who face a difficult choice between their conscience and their livelihood.[35] Students at public universities face similarly stark choices. *See*, *e.g.*, *Ward*, 667 F.3d at 738. If the lower courts' declaration that refusing to endorse same-sex marriage demonstrates discrimination towards gays and lesbians were adopted by this Court, conflicts like these will be even more widespread as religious believers' long-held views on marriage suddenly become *prima facie* evidence of discriminatory animus under anti-discrimination laws.

## II. State legislatures and electorates are better able than federal courts to take into account all of the societal interests at stake, including protecting religious liberty.

This Court should hesitate to strike down the Utah and Oklahoma provisions at issue here for another reason as well: doing so "would short-circuit" the state political processes already at work in this area. *Jackson v. Abercrombie*, 884 F.Supp.2d 1065, 1072 (D. Haw. 2012)

---

*at* http://www.nytimes.com/2004/05/17/us/massachusetts-arrives-at-moment-for-same-sex-marriage.html?pagewanted=all&src=pm .

[35] Robin Fretwell Wilson, *A Matter of Conviction: Moral Clashes Over Same-Sex Adoption*, 22 BYU J. Pub. L. 475 (2008) (describing dismissals and resignations of social service workers where conscience protections were not provided).

(federal court decision declining to impose same-sex marriage; Hawaii then adopted same-sex marriage with religious liberty protections) (quotation omitted). "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). As a result, "[t]he doctrine of judicial self-restraint requires [this Court] to exercise the utmost care whenever we are asked to break new ground in this field." *United States v. Jarvis*, 299 F. App'x 804, 808 (10th Cir. 2008) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). Eleven states and the District of Columbia have already enacted same-sex marriage laws, *all* of which provide greater protection for religious dissenters than the court decisions that gave rise to the Utah and Oklahoma laws. Striking down the Utah and Oklahoma laws as Plaintiffs request risks turning a very active political debate into a dead end. It would also communicate a profound and, *amicus* believes, unjustified mistrust in the ability of Americans to debate and decide important political issues for themselves.

Appellate Case: 14-5003     Document: 01019300563     Date Filed: 02/10/2014     Page: 40

### A. Because many of the conflicts between same-sex marriage and religious liberty can be avoided—at least in part—by legislative exemptions, the federal judiciary should allow state legislatures and electorates to go first.

Eleven states—Maine, Maryland, New Hampshire, New York, Washington, Vermont, Delaware, Minnesota, Rhode Island, Hawaii, and Illinois—and the District of Columbia have adopted same-sex marriage by legislative action.[36] Although their laws vary, and no state has provided complete protection to conscientious objectors, each jurisdiction has attempted to address the conflicts between same-sex marriage and religious liberty by providing accommodations for conscientious objectors.[37] For example, all of these jurisdictions exempt

---

[36] Massachusetts, Iowa, California, New Jersey, and New Mexico have same-sex marriage by judicial rulings. See *Goodridge*, 798 N.E.2d 941; *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010) *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) *vacated and remanded sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *Garden State Equal. v. Dow*, 62 A.3d 336 (N.J. Super. Ct. Law Div. 2013); *Griego v. Oliver*, --- P.3d ---- (N.M. 2013). Connecticut's legislature adopted same-sex marriage legislation—with several religious exemptions—after its previous marriage/civil union system was struck down. *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *see* Conn. Gen. Stat. §§ 46b-35a, 46b-35b, 38a-624a (providing religious exemptions).

[37] 2012 Me. Legis. Serv. § 1 (I.B. 3) (exempting clergy and religious organizations from "host[ing] any marriage in violation of" their religious beliefs and protecting them from lawsuits or loss of tax-exempt status for their failure to do so) (to be codified at Me. Rev. Stat. Ann. tit.

19-A, § 655); 2012 Md. Laws ch. 2 § 2-2, -3, -4 (exempting religious organizations from solemnizing or providing services or accommodations related to the solemnization and protecting their ability to offer religious programs consistent with their definition of marriage; permitting religious fraternal organizations to limit insurance coverage to spouses in opposite-sex marriages; and permitting religious adoption and foster care agencies which do not receive government funding to limit their placements to opposite-sex married couples) (to be codified at Md. Code Ann., Fam. Law §§ 2-201, 2-202, 2-406); N.H. Rev. Stat. § 457:37 (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges . . . related to" the "solemnization," "celebration," or "promotion" of a marriage); N.Y. Dom. Rel. Law § 11(1) (exempting religious organizations from solemnizing or providing services or accommodations related to the solemnization of marriages that they do not recognize; protecting religious organizations' ability to limit certain kinds of housing to opposite-sex spouses); Vt. Stat. Ann. 9 § 4502(l) (2009) (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges . . . related to" the "solemnization" or "celebration" of a marriage); Wash. Rev. Code § 26.04.010 (2012) (exempting religious organizations from solemnizing or providing services or accommodations related to the solemnization of marriages that they do not recognize); Del. Code Ann. tit. 13, § 106(e) (exempting "any clergyperson or minister of any religion" from solemnizing a marriage); Minn. Stat. Ann. § 517.09, Subd. 2, 3 (exempting religious nonprofits from providing "goods or services at the solemnization or celebration of any civil marriage," protecting objectors from private suits and government penalties); R.I. Gen. Laws Ann. § 15-3-6.1 (exempting religious nonprofits from providing wedding services, protecting objectors from private suits and government penalties); Haw. Rev. Stat. § 572-12.1-12.2 (exempting religious nonprofits from providing "goods, services, or its facilities or grounds for the solemnization or celebration" of a marriage; protecting objectors from private suits and government penalties); 750 Ill. Comp. Stat. Ann. 5 / 209 (exempting religious nonprofits from providing

clergy from officiating a same-sex wedding, and all except Delaware exempt religious nonprofits from providing wedding services and protect objectors from private suits and government penalties.[38] Leading church-state scholars have also stepped in to help guide lawmakers by developing model legislation that both adopts same-sex marriage and provides adequate protection for religious liberty concerns.[39]

This experience—that every state legislature to adopt same-sex marriage has paired same-sex marriage legislation with religious liberty protections—is strong evidence counseling in favor of federal judicial restraint. The decisions below end those democratic processes

---

"religious facilities for the solemnization ceremony or celebration" of a marriage; protecting objectors from private suits and government penalties); D.C. Code § 46-406(e) (exempting religious organizations from providing "services, accommodations, facilities, or goods . . . related to" the "celebration," "solemnization," or "promotion" of a marriage).

[38] Zylstra, Sarah Eekhoff, "Evangelicals' Favorite Same-Sex Marriage Law?" *Christianity Today*, Jan. 1, 2014, *available at* http://www.christianitytoday.com/ct/2014/january-web-only/evangelicals-favorite-same-sex-marriage-law-oklahoma-utah.html.

[39] *See* Archive, *supra*.

prematurely, both in Utah and Colorado, but also in other states within the Tenth Circuit.

Moreover, the fact that every state legislature to address same-sex marriage has recognized the conflict with religious liberty is also strong evidence that this concern is rational. Put another way, if protecting religious liberty is irrational, then all of these legislatures were acting irrationally at the time they passed legislation adopting same-sex marriage.

The truth, of course, is that the state legislatures and voters who have adopted these laws have attempted to balance competing legitimate societal interests. And that is something that state political actors—legislatures and electorates—can do far more easily than the federal judiciary.

## B. Allowing state legislatures and electorates to decide both reinforces democratic values and allows room for compromise between conflicting societal interests.

Striking down the Utah and Oklahoma laws would result in the inevitable perception that overturning the Utah and Oklahoma laws was anti-democratic. In both cases, the state legislature proposed a marriage amendment because it wanted the electorate—not the

judiciary—to decide on the definition of marriage. Overturning the Utah and Oklahoma laws would be seen, rightly or wrongly, as this Court overruling both the state legislatures and the voters. And it would also send the message that Americans and their representatives are not competent to decide thorny issues.

John Hart Ely famously said that "constitutional law appropriately exists for those situations where representative government cannot be trusted, not those where we know it can." *Democracy and Distrust* 183 (1980). This is a situation where representative government *can* be trusted. That many people disagree strongly is simply a sign that the debate is not over. Indeed, democracy without disagreement is not worthy of the name. *See*, *e.g.*, Isaiah Berlin, *Two Concepts of Liberty*, *in Four Essays on Liberty* 118 (Oxford 1969); Robert Huckfeldt, Paul E. Johnson & John Sprague, *Political Disagreement* (2004) (. . . a democracy without conflict and disagreement is not a democracy. Democratic institutions are not designed to eliminate conflict and disagreement, but only to manage disagreement in a productive manner."). And citizens reasoning through those disagreements—the very process of deliberation—ensures the vitality of our democratic

system by accepting, rather than suppressing, disagreement and dissent:

> If citizens do not try to deliberate about issues such as sexual harassment, homosexual rights, or racial justice, they may never learn how to do so responsibly. Sexist, homophobic, and racist messages will not thereby disappear from American politics; they will retreat between the lines.

Amy Guttman & Dennis Frank Thompson, *Democracy and Disagreement* 109 (1996).

Moreover, using the judicial power to strike down the Utah and Oklahoma laws in question will also prevent these states' legislatures and electorates from arriving at workable compromises regarding religious liberty. Although many have argued in the press or elsewhere that the debate over same-sex marriage is a winner-take-all battle, there is potential middle ground. Professor Laycock has explained that:

> unavoidable conflict [between the interests of same-sex couples and the interests of conscientious objectors] does not necessarily mean unmanageable conflict. For the most part, ***these conflicts are not zero-sum games***, in which every gain for one side produces an equal and opposite loss for the other side. If legislators and judges will treat both sides with respect, harm to each side can be minimized. Of course that is a huge "if."

Douglas Laycock, *Afterword*, *in Emerging Conflicts* 196 (emphasis added). Managing these conflicts will require detailed exploration and

Appellate Case: 13-4178    Document: 01019300459    Date Filed: 02/10/2014    Page: 46

balancing of all of the societal interests at stake. That is a job that legislatures can undertake far more easily than the judiciary. In Justice Brennan's view, "government grants exemptions to religious organizations because they uniquely contribute to the pluralism of American society by their religious activities"—but those exemptions can only be granted, and pluralism protected, through political, not judicial processes.[40]

Finally, without judicial intervention, voters are free to revisit their decisions. That is what happened in Maine: in 2009, voters rejected a same-sex marriage law in a statewide referendum, but in 2012, they adopted a same-sex marriage law—including religious exemptions—in a second statewide referendum. *Maine Rejects Same-Sex Marriage Law*, CNN.com, Nov. 4, 2009[41]; *A Festive Mood in Maine as Same-Sex Marriage Becomes Legal*, N.Y. Times, Dec. 30, 2012, at A20.[42] By contrast, were the question removed from ordinary political processes,

---

[40] *Walz v. Tax Comm'n*, 397 U.S. 664, 692 (1970) (Brennan, J., concurring).

[41] http://articles.cnn.com/2009-11-04/politics/maine .same.sex_1_marriage-maine-john-baldacci-same-sex?_s=PM:POLITICS.

[42] http://www.nytimes.com/2012/12/30/us/same-sex-marriage-becomes-legal-in-maine.html.

such reconsideration and societal efforts at compromise would be all but impossible.

\* \* \*

At this juncture in our Nation's political life, same-sex marriage and religious liberty stand in conflict. Given that conflict—acknowledged by scholars and legislatures alike—it is not irrational for voters, or legislatures, or the courts to act to protect the rights of conscience. Since court decisions left Americans with an all-or-nothing choice between same-sex marriage and full protection for the rights of conscience, the Utah and Oklahoma laws were entirely rational responses to the threat to religious liberty.

The wide-ranging nature of the conflict also implicates the federal judicial role. The laws under review here present multi-dimensional social issues, as well as complex issues of federalism and separation of powers. Yet because federal courts are limited to resolving cases and controversies, they are forced to address these complex issues in a binary way. That structural limitation, taken together with the prospect of legislative solutions and the high value our country puts on

both federalism and religious freedom, counsels judicial restraint in the cases before the Court.

## CONCLUSION

The Court should reverse the decisions below.

Dated: February 10, 2014

Respectfully submitted,

*s/ Eric Rassbach*

Eric Rassbach
Asma Uddin
*The Becket Fund for Religious Liberty*
*3000 K St. NW, Suite 220*
*Washington, DC 20007*
*Tel: (202) 955-0095*
*Fax: (202) 955-0090*
*erassbach@becketfund.org*

Appellate Case: 13-4178    Document: 01019200459    Date Filed: 02/10/2014    Page: 49

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Century Schoolbook font.

Date: February 10, 2014          *s/ Eric Rassbach*

                                    Eric Rassbach

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2014, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to the following:

**Case No. 13-4178:**

David C. Codell
dcodell@nclrights.org

John J. Bursch
jbursch@wnj.com

Kathryn Kendell
kkendell@nclrights.org

Philip S. Lott
phillott@utah.gov

Shannon Price Minter
SMinter@nclrights.org

Stanford E. Purser
spurser@utah.gov

James E. Magleby
magleby@mgpclaw.com

Gene C. Schaerr
gschaerr@gmail.com

Jennifer Fraser Parrish
parrish@mgpclaw.com

Monte Neil Stewart
stewart@stm-law.com

Peggy Ann Tomsic
tomsic@mgpclaw.com

*Attorneys for Defendants-Appellants*

*Attorneys for Plaintiffs-Appellees*

Ralph E. Chamness
rchamness@slco.org

Darcy Marie Goddard
dgoddard@slco.org

*Attorneys for Defendant Swensen*

**Case Nos. 14-5003, 14-5006:**

Don Gardner Holladay
dholladay@holladaychilton.com

James Edward Warner, III
jwarner@holladaychilton.com

Joseph Thai
thai@post.harvard.edu

*Attorneys for Plaintiffs-Appellees / Cross-Appellant*

W. Scott Simpson
scott.simpson@usdoj.gov

*Attorney for Defendant*

Byron Jeffords Babione
bbabione@alliancedefendingfreedom.org

James Andrew Campbell
jcampbell@alliancedefendingfreedom.org

David Austin Robert Nimocks
animocks@alliancedefendingfreedom.org

John David Luton
jluton@tulsacounty.org

*Attorneys for Defendant-Appellant / Cross-Appellee*

Kerry W. Kircher
kerry.kircher@mail.house.gov

*Attorney for Defendant-Intervenor*

Date: February 10, 2014          *s/ Eric Rassbach*

                                 Eric Rassbach

Appellate Case: 13-4178   Document: 01019280479   Date Filed: 02/10/2014   Page: 52

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection (last updated February 9, 2013) and, according to the program, is free of viruses.

*s/ Eric Rassbach*
Eric Rassbach